BECKMAN COTTON COMPANY, Plaintiff-Appellant Cross-Appellee,

v.

The FIRST NATIONAL BANK OF ATLANTA, Defendant-Appellee Cross-Appellant.

No. 80–7774.

United States Court of Appeals, Fifth Circuit.*
Unit B

Jan. 22, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

William G. McDaniel, Alan L. Dye, Atlanta, Ga., for plaintiff-appellant cross-appellee.

Gary W. Hatch, Atlanta, Ga., for defendant-appellee cross-appellant.

Before TUTTLE, RONEY and ANDERSON, Circuit Judges.

RONEY, Circuit Judge:

In this case, the district court refused to grant damages claimed by Beckman Cotton Company as a result of defendant First National Bank of Atlanta's mishandling of and initial refusal to honor an international letter of credit. It held that the actions taken by Beckman which established its damages were "simply not a valid procedure under the Uniform Commercial Code to remedy a breach or to mitigate damages." We reverse the court's decision that the procedure used to mitigate damages was invalid, affirm the decision that Beckman had standing to recover for breach of the letter of credit issued by the bank, and remand the case for consideration of whether the bank breached the letter of credit.

The facts are a little unusual. The case involves a letter of credit issued by the defendant bank in connection with the sale of cotton in the Philippines. Plaintiff Beckman Cotton Company, a Tennessee cotton broker, contracted to sell cotton to a Philippine company, Yupangco Cotton Mills, Inc. Yupangco desired to finance the purchase pursuant to an export finance program sponsored by an American governmental agency, the Commodity Credit Corporation (CCC). Such program insures prompt payment in full by CCC to the seller (Beckman) immediately after the goods are exported, and allows the purchaser (Yupangco) three years to pay for the goods by making payments to the CCC. As a condition precedent to CCC's participation, the CCC requires that an irrevocable letter of credit be issued by a United States bank against the purchaser in favor of CCC, providing for repayment to the CCC over the ensuing three-year period.

Yupangco through its Philippine bank, the Development Bank of the Philippines, applied to the defendant First National Bank of Atlanta (FNB) to issue such a letter of credit in favor of the CCC. The letter of credit expressly provided that shipment "must be made from U.S. Gulf Ports to Manila, Philippines, not later than October 15, 1977," and that the letter of credit would not be operative until the Atlanta bank notified CCC that certain specified documents, including "Clean On-Board Ocean Bill of Lading to the order of Development Bank of the Philippines," had been received from Beckman immediately after shipment, but no later than October 30, 1977.

The dates become important as they relate to the bank's failure to honor the letter of credit. We set forth here only sufficient facts to establish the backdrop for Beckman's actions which were faulted by the district court. Beckman shipped the cotton by rail from Houston and New Orleans to Los Angeles on October 5, 1977. It was laden on board an ocean vessel for transport to Manila on October 15. Although initially some question was raised, this method of shipment satisfied the requirement that shipment be made from a U.S. Gulf Port. All of the required documents were not received by the bank until October 31, although for our purposes, it is the same as if they were received by October 30. FNB decided, however, that the documents were not timely received within 21 days of the date of shipment. This determination was based on the notion that October 5, the date of the rail shipment, was the date of shipment, not October 15, when the cotton was laden on board the ocean vessel in Los Angeles. If October 5 was the operative date the documents should have been received by October 26. The bank did not distinguish the "on board" date from the "laden on board ocean" vessel date referred to in the letter of credit.

FNB then notified the Development Bank of the supposed discrepancy and de-

clined to honor its credit obligation unless the discrepancy was waived by the Development Bank. The Development Bank in turn sought a waiver from its customer, Yupangco, but Yupangco refused to waive any discrepancy. Such a refusal occurred because the price of cotton had dropped from the 64 cents per pound contract price to 52 cents when the cotton was actually shipped. Despite numerous attempts at negotiation among the parties, the Atlanta bank notified Beckman that because the Development Bank would not waive the defect, FNB could not notify CCC that the credit was operative, therefore Beckman could not be paid by the CCC.

Beckman thereupon set about to obtain a waiver of the alleged stale presentation by dealing directly with the Development Bank and Yupangco. Yupangco finally consented to waive any discrepancies after the president of Beckman went to the Philippines and paid Yupangco $45,490.00, the difference between the contract price and the then prevailing market price. The Development Bank notified FNB that the waiver had been obtained, FNB immediately confirmed to the CCC that the letter of credit was operative, and CCC then paid Beckman the full contract price.

This left Beckman, however, short the $45,490.00 it had paid Yupangco and the expenses involved in the negotiation. Beckman therefore sued for damages on the ground that FNB received the correct papers within the time specified, should have notified CCC of that fact, and by failing to do so breached the letter of credit and caused the expenditures. Contrary to defendant's argument, the district court held Beckman had standing to recover for a breach of the letter of credit, if there was one. The court declined to decide whether the bank actually breached the terms of the letter of credit, holding that Beckman's damages were not recoverable even if there were a breach because the action of Beckman in paying Yupangco was "simply not a valid procedure under the Uniform Commercial Code to remedy a breach or to mitigate damages."

Beckman appeals the damage issue and FNB cross-appeals on the issue of Beckman's standing.

### Standing

This being a diversity action, the rights of the parties are governed by Georgia law. The district court found that under Georgia law Beckman was a third-party beneficiary of the letter of credit addressed to the CCC and therefore has standing to maintain this suit. FNB contends that CCC, not Beckman, was the beneficiary of the letter of credit and therefore Beckman lacks standing to maintain this suit. Only because the United States Government facilitates international transactions by extending long term credit to foreign buyers through the CCC is the CCC rather than Beckman named in the letter of credit. The beneficiary of a contract made between parties for its benefit may maintain an action against the promisor on the contract. Ga.Code Ann. § 3–108. The only requirement is that the third-party be an intended beneficiary. *Hercules, Inc. v. Stevens Shipping Co.*, 629 F.2d 418, 422 (5th Cir. 1980). Therefore, Beckman's status depends on the intention of the contracting parties to benefit it as a third party.

FNB sent a copy of the credit letter to Beckman and in its own letter of credit procedures equated "beneficiary" with seller/exporter. This shows that the parties contemplated Beckman as an intended beneficiary of the contract. The district court correctly held that Beckman has standing to sue, as a third-party beneficiary.

### Validity of Action in Mitigation

Whether the payment by Beckman to Yupangco was an acceptable procedure to mitigate damages under Georgia's Uniform Commercial Code turns on whether it was commercially reasonable. If an issuer wrongfully dishonors a draft or demand for payment under a credit letter, the person entitled to the honor may recover from the issuer the face amount of the draft or demand together with incidental damages. Ga.Code Ann. § 109A–5–115(1). Incidental

damages include all commercially reasonable expenditures. Ga.Code Ann. § 109A–2–710. The test of commercial reasonableness is a practical one, requiring primarily honesty and good faith in attempting to minimize damages. *See Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698 (E.D.Pa.), *aff'd*, 398 F.2d 310 (3d Cir. 1968). What is commercially reasonable "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1951).

The text of section 5–115(1) does not expressly impose or negate a duty to mitigate damages. R. Anderson, Uniform Commercial Code, § 5–115:4 at 426 (2d ed. 1971). On the other hand, section 5–115(1) does not automatically require the face amount of the draft to be the sole measure of damages.

■ The circumstances existing at the time of delivery justified Beckman's actions. At the time of FNB's dishonor, the cotton was on board an ocean vessel on its way to the Philippines. Once the cotton arrived in Manila, nondelivery would create problems for Beckman. There were no bonded warehouses in the Philippines, theft from the docks was rampant, and Beckman's cotton was subject to confiscation by the Philippines customs authorities if not removed from the docks. One of the most feasible alternatives for Beckman to minimize its loss was to sell to Yupangco. In ordinary circumstances, the rejection of the goods by the buyer requires that a different buyer be located. The rejection here, however, was caused by a price break and an opening for the purchaser to negate the contract, not the acceptability of the cotton or the buyer's lack of need for it. The "rejection" was permitted because of the alleged wrongful act on the part of FNB, leaving the buyer, Yupangco, in the position of nonbreaching buyer. Consequently, Yupangco was considered by Beckman to be a potential buyer. The result was, in essence, a new contract with the original buyer. The renegotiation resulted in a sale where no sale might have taken place otherwise. The choices were between reselling to Yupangco and suffering the least possible loss, possibly risking forfeiture of the goods entirely, or reselling the cotton to another buyer with the possibility of an even greater loss.

Beckman's conduct therefore did not transform the partial refund of the original purchase price on the cotton into a "bribe," as it was described by the district court. The payment to Yupangco was merely a refund of the difference between the original contract price of the cotton and the then prevailing international market price of cotton. Such action, under the circumstances, was appropriate and commercially reasonable. The district court thus erred in deciding the case on the inappropriateness of the attempt to mitigate damages.

The district court expressly declined to reach the question whether the dishonor of the letter of credit was wrongful. Although the point was argued to us, it is better to return the case to the district court for its initial decision on this point.

The judgment is vacated and the case remanded to the district court to decide whether the defendant bank breached the terms of the letter of credit and such other matters that may come before it as a result of this decision.

VACATED AND REMANDED.